59 CCPA
**Application of Richard H. KARPIK and David H. Griffiths.**

**Patent Appeal No. 8672.**

United States Court of Customs and Patent Appeals.

Aug. 17, 1972.

Rehearing Denied Nov. 9, 1972.

William P. Hickey, Toledo, Ohio, attorney of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Jere W. Sears, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, sustaining the rejection of claims 6–11 in appellants' patent application.[1] No claims have been allowed.

### The Invention

Appellants' invention relates to sizing compositions useful in sizing glass fibers. Such compositions contain in major part a film-forming material, usually starch, which provides a protective sheath around the fibers to shield the fibers against abrasion and moisture attack. The sizes may conventionally contain other materials, such as lubricants and emulsifiers.

Apparently the use of previous sizing compositions was plagued with a problem called "migration." Appellants define migration as "the movement of the solids content of forming size compositions to the outer surface of the wound packages or bobbins which are formed from the sized glass fibers." Appellants point to numerous difficulties caused by migration in products manufactured from sized glass fibers.

---

1. Serial No. 523,498, filed January 12, 1966, which is a continuation-in-part of Application Serial No. 92,745, filed March 2, 1961.

Appellants contend that their sizing compositions have a greatly reduced tendency to migrate, compared to previous compositions. The film-former is the critical material in appellants' compositions. It is a starch which contains starch granules which are swollen but unburst, and, at least preferably, has a high amylose to amylopectin ratio. Apparently starch having a high amylose to amylopection ratio must be heated to a higher temperature before all of its granules will burst.

Claims 6 and 8 are representative:

6. A forming size composition for glass fibers consisting essentially of an aqueous dispersion of between 1.5 to 9% by weight of a hybrid corn starch comprising between 50 to 70% by weight of amylose and between 30 to 50% by weight of amylopectin, between .5 to 6% by weight of a nonionic lubricant selected from the group consisting of animal oil and vegetable oil and between .05 to 1.5% by weight of cationic lubricant said aqueous dispersion of starch being generally equivalent to one cooked below a temperature of approximately 212° F in that it comprises swollen but incompletely burst starch granules in an amount which will substantially reduce migration of the starch during drying of the coating on fibers tightly wound into packages.

8. In the coating of glass fibers with a forming size composition which contains an aqueous dispersion of an amylaceous film-forming material, the improvement comprising cooking a hybrid corn starch consisting essentially of between 50 to 70% by weight of amylose and between 30 to 50% by weight of amylopectin in water to a degree corresponding to that achieved at a temperature below approximately 212°F in an open receptacle, to provide a combination of film forming starch and swollen unburst starch granules, and applying the mixture to the glass fibers without appreciable further break down of the swollen granules.

Claim 7 is directed to "Migration free wound packages of fibrous glass sized with an amylaceous film-forming material consisting essentially of the dried residue of" the size composition of claim 6. Claim 9 is drawn to glass fibers having as a coating a size composition made in accordance with claim 8. Claim 10 is dependent on claim 9 and recites a particular amylose to amylopectin ratio. Claim 11 depends on claim 9 and recites that the starch material comprises 1–2% by weight of the dry coated fibers.

### The Rejection

■ The board sustained the rejection of claims 6–11 "as obviously fully met, under 35 U.S.C. § 102(b), by any one" of four patents. The four patents are the Belgian and French counterparts to a U.S. patent to Griffiths,[2] and the Belgian and French counterparts to a U.S. patent to Triplett et al. (Triplett).[3] The four foreign patents all issued more than a year prior to appellants' present application and the sole issue properly before us is whether appellants can rely on the filing date of their parent application under 35 U.S.C. § 120 to antedate those patents.[4]

2. U.S. Patent No. 3,227,192, issued January 4, 1966 on an application filed April 2, 1962. Its Belgian counterpart is Patent No. 630,448, of October, 1963, and its French counterpart is Patent No. 1,363,976 of May, 1964.

3. U.S. Patent No. 3,265,516, issued August 9, 1966, on an application filed April 18, 1962. Its Belgian counterpart is Patent No. 631,196, of October, 1963, and its French counterpart is Patent No. 1,-

371,192 of July, 1964. Only the U.S. patents appear in the record before us, the parties relying on them as translations of the French and Belgian patents.

4. While appellants do devote part of their brief to an argument that the Griffiths and Triplett patents do not constitute anticipations of the presently claimed subject matter, that argument was not fairly part of the "sole issue" presented

In order for appellants to be entitled to rely on the filing date of their parent application under 35 U.S.C. § 120, the presently claimed subject matter must have been disclosed in that application as filed "in the manner provided by the first paragraph of section 112 * * *." The examiner contended that:

[T]he particular recited cooking temperature of the starch composition, i. e., "below a temperature of approximately 212° F" and the product resulting from said cooking [,i. e.,] "partially cooked swollen but incompletely burst starch granules" are considered limitations without support in the parent application * * *.

Appellants' parent application discloses the use of a hybrid starch having a high amylose to amylopectin ratio. The first step in making the size composition is described as follows:

A forming size composition is prepared from the above ingredients by placing all of the starch and one-half of the water in a suitable receptacle, adjusting the pH to 6.0± .2 with hydrochloric acid and *cooking* the starch. [Emphasis added.]

Appellants take the position that the parent application sufficiently discloses the recitations referred to by the examiner because: (1) since the method of cooking is not delineated in the above quote, one reading the application would take it to mean the *conventional* method of cooking starch; (2) the conventional method of cooking starch at the time the parent application was filed was boiling it in water at atmospheric pressure, thus at a temperature of about 212° F; and (3) boiling the hybrid starch referred to in water at about 212° F. *inherently* gives a starch containing swollen but unburst granules. In support of their position, appellants introduced an affidavit by appellant Karpik. The most pertinent statements in that affidavit were to the effect that starch was cooked in open top kettles by the two companies who were commercially applying starch sizes to glass fibers prior to March 2, 1961, the filing date of the parent application. Appellants also introduced an affidavit by their attorney, which indicates that he reviewed the U. S. patent literature having to do with coating materials useful as sizes and coatings. His most pertinent conclusions are stated as follows:

In reviewing the patents which were filed prior to March 2, 1961, it was found that the majority of these patents dealt with starch materials for use as a textile size or as adhesives such as are used in the paper box making industry. In none of the patents dealing with starches for use as textile sizing and/or paper coating was the word "autoclaving" used to describe the manner of cooking starch. In many of these patents dealing with textile sizing and paper coating materials, a temperature of cook was indicated which in every instance was below 212° F. In many more of these patents, the temperature of cooking was not indicated and only the words "cooked" or "cooking" appeared in the patent. U.S. patent 3,103,451 issued September 10, 1963 and filed January 25, 1960 and assigned to one of the large manufacturers of starches, states in numerous instances that *the conventional means of cooking starch is with water at 200–210° F.*

The board generally agreed with the examiner's views with regard to the disclosure in the parent application. It pointed out that there was no disclosure in the parent dealing with "swollen but incompletely burst starch granules." It apparently accepted appellants' contention that cooking the particular hybrid starch described in the parent case at 212° F would inherently give a product with swollen but not completely burst starch granules, but stated:

These affidavits would seem to be of little help because the parent appli-

before the board, and it is not covered by any of appellants' reasons of appeal. We will therefore not consider that argument. 35 U.S.C. § 142.

cation discloses no cooking temperature which can be made the basis for a showing as to inherency and no showing that the starch granules shall be in any other condition than "cooked". If we are to give weight to Hickey's affidavit, the prior starch art in all cases obtained complete cooking by heating temperatures suitable to obtain a complete swollen and "burst" product. If any significance can be attached to the parent application disclosure of "cooking", it would be that such a complete bursting of the starch granules is obtained by the cooking operation.

The board considered the general statements concerning the conventional practices in the starch cooking art in Karpik's affidavit of little value in this case, since the affidavit does not establish the extent of appellant Karpik's experience in that art, and "since that parent application's reference to 'cooking' is not a reference, necessarily, to 'conventional' cooking unless we assume that the application refers to a *complete cooking*." The board criticized appellants' attorney's affidavit on the bases that it did not give enough information to support a conclusion as to the extent of the search made of the prior art; that the fact that a group of patents did not use the exact term "autoclaving" does not mean that no methods of cooking starch other than open kettle cooking were disclosed in those patents; and that the very patent relied on by the affidavit to establish the conventional method of starch cooking "recognizes the practice of heating starch at superatmospheric pressure with steam * * * and refers to apparatus for this purpose."

### Opinion

■ The board's position can be summarized as being (1) that those skilled in the art would interpret the parent application as requiring that the hybrid starch be fully cooked, i. e., to the extent that all its granules are burst; and (2) that, at any rate, appellants have not established that the "conventional" way of cooking starch at the time the parent application was filed was aqueous boiling at atmospheric pressure. We are in full agreement with the board on both points.

Throughout the prosecution of the present, continuation-in-part application, appellants have emphasized that prior to their invention everybody in the starch industry cooked their starch until the granules were completely burst, and, when they had to deal with a high-amylose starch, they chemically or otherwise modified the starch to make it water-dispersible at lower temperatures. Against this background appellants have argued that their invention takes advantage of the properties of starch containing unburst granules. We do *not* think the background can be ignored in determining what one skilled in the art would glean from the disclosure of the parent application. That disclosure contains nothing about unburst starch granules. In an art where cooking was normally carried out until all the granules were burst, the reasonable interpretation of the parent application would have been that the hybrid starch therein described be so cooked. Appellants' argument, that the board turned the verb "cooking" as it appeared in the parent application and changed it into an adverb describing the degree of cooking is supertechnical and totally unpersuasive.

With regard to what method of starch cooking was "conventional" before the filing date of the parent application, the patent relied on by appellants acknowledges the practice of heating starch at superatmospheric pressure to be old and cites three prior U.S. patents as disclosing apparatus for doing so. We also agree with the board's criticisms, referred to above, of appellants' affidavits.

The decision of the board is affirmed.

Affirmed.